Docket Numbers: 13-1015 and 13-1016 (Consolidated)
ORAL ARGUMENT NOT YET SCHEDULED
_____

UNITED STATES COURT OF APPEALS

DISTRICT OF COLUMBIA
_____

Delaware Riverkeeper Network, New Jersey Highlands Coalition, and Sierra Club, New Jersey Chapter, *Petitioners*,

v.

Federal Energy Regulatory Commission, *Respondent*, and

Tennessee Gas Pipeline Company, L.L.C., and Statoil Natural Gas, L.L.C., *Intervenors*.
_____

BRIEF OF DELAWARE RIVERKEEPER NETWORK, NEW JERSEY

HIGHLANDS COALITION, AND SIERRA CLUB, NEW JERSEY CHAPTER

IN SUPPORT OF PETITION FOR REVIEW OF

FEDERAL ENERGY REGULATORY COMMISSION ORDERS

139 FERC ¶ 61,161 and 142 FERC ¶ 61,025

_____

Jane P.D. McClintock
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, Pennsylvania 19007
215-369-1188 (tel)
jane@delawareriverkeeper.org

Susan Kraham
Columbia Environmental Law Clinic
Columbia University School of Law
425 West 116th Street
New York, NY 10027
212-854-4376 (tel)
skraha@law.columbia.edu

*Attorneys for Petitioners*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

<u>Parties and Amici</u>

As per Circuit Rule 28(a)(1)(A), the undersigned, on behalf of Delaware Riverkeeper Network, New Jersey Highlands Coalition, and Sierra Club, New Jersey Chapter, hereby states that as of the date of filing the Docketing Statement, the following entities are parties, intervenors, or amici in this Court in this and all related cases:

*Petitioners*: Delaware Riverkeeper Network, New Jersey Highlands Coalition, and Sierra Club, New Jersey Chapter; George C. Feighner.

*Respondents*: The U.S. Federal Energy Regulatory Commission.

*Intervenors*: Tennessee Gas Pipeline Company; Statoil Natural Gas, LLC.

Parties who have appeared before the U.S. Federal Energy Regulatory Commission in respect to the rehearing request for the Order at issue herein are:

*Petitioners*: Delaware Riverkeeper Network, New Jersey Highlands Coalition, and Sierra Club, New Jersey Chapter; George C. Feighner.

*Applicant*: Tennessee Gas Pipeline Company, L.L.C.

Parties who have appeared before the U.S. Federal Energy Regulatory Commission in respect to the Order at issue herein are:

*Applicant*: Tennessee Gas Pipeline Company, L.L.C.

*Intervenors*: Delaware Riverkeeper Network; New Jersey Highlands Coalition; Sierra Club, New Jersey Chapter; New York State Public Service Commission; the New Jersey Department of Environmental Protection, the National Park Service; the New Jersey Board of Public Utilities; Chesapeake Energy Marketing, Inc.; Atmos Energy Corporation; Atmos Energy Marketing LLC; Calpine Energy Services, L.P.; Consolidated Edison of New York, Inc. and Orange and Rockland Utilities, Inc.; Constellation Energy Commodities Group, Inc.; EQT Energy, LLC;

George C. Feighner; Ellen Hay and Milton Newman; Inergy Midstream, LLC; Louisville Gas & Electric Company; Millenium Pipeline Company, LLC; National Fuel Gas Distribution Corporation; National Grid Gas Delivery Companies; New England Local Distribution Companies; New Jersey Natural Gas Company; NJR Energy Services Company; Piedmont Natural Gas Company; ProLiance Energy, LLC; PSEG Energy Resources & Trade, LLC; Statoil Natural Gas, LLC; UGI Distribution Companies.

Rulings Under Review

As per Circuit Rule 28(a)(1)(B), the rulings under review are U.S. Federal Energy Regulatory Commission Order *Tennessee Gas Pipeline Company, L.L.C.*, 139 FERC ¶ 61,161 (2012) (May 29, 2012 order approving issuance of Certificate of Public Convenience and Necessity) and 142 FERC ¶ 61,025 (2013) (January 11, 2013 order denying Petitioners' rehearing request).

Related Cases

As per Circuit Rule 28(a)(1)(C), the following are related cases:

*In re Delaware Riverkeeper Network and New Jersey Highlands Coalition*, No. 13-1004 (D.C. Cir. Jan. 17, 2013) (denial of All Writs Act petition seeking stay of Order 139 FERC ¶ 61,161).

Respectfully submitted this 26th day of April, 2013,

/s/ Jane P.D. McClintock
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
215-369-1188 (tel)

/s/ Susan Kraham
Columbia Environmental Law Clinic
Columbia University School of Law
425 West 116th Street
New York, NY 10027
212-854-4376 (tel)

*Attorneys for Petitioners*

## RULE 26.1 DISCLOSURE STATEMENT

Delaware Riverkeeper Network (DRN) is a not-for-profit 501(c)(3) membership organization that advocates for the protection of the Delaware River, its tributaries, and the communities of its watershed. DRN does not have any parent corporation, nor does it have stock.

The New Jersey Highlands Coalition is a not-for-profit 501(c)(3) membership organization that advocates for the protection of the natural resources in the Highlands Region. It does not have any parent corporation, nor does it have stock.

The Sierra Club is a not-for-profit 501(c)(3) membership organization. It does not have any parent corporation, nor does it have stock.

Respectfully submitted this 26th day of April, 2013,

> /s/ Jane P.D. McClintock
> Delaware Riverkeeper Network
> 925 Canal Street, Suite 3701
> Bristol, PA 19007
> 215-369-1188 (tel)
>
> /s/ Susan Kraham
> Columbia Environmental Law Clinic
> Columbia University School of Law
> 425 West 116th Street
> New York, NY 10027
> 212-854-4376 (tel)
>
> *Attorneys for Petitioners*

iv

## TABLE OF CONTENTS

GLOSSARY ................................................................................... xiii

JURISDICTIONAL STATEMENT ................................................1

STATEMENT OF ISSUES .............................................................2

STATUTES AND REGULATIONS ...............................................2

STATEMENT OF FACTS ..............................................................2

SUMMARY OF ARGUMENT ........................................................4

STANDING .....................................................................................5

ARGUMENT ...................................................................................6

   I.     STANDARD OF REVIEW .......................................................6

   II.    NEPA's Statutory and Regulatory Scheme ...............................7

   III.   FERC Failed to Evaluate the Impacts of the NEUP in
         Accordance with its NEPA Obligations ...................................8

      A.    FERC Unlawfully Segmented its Review of
           Interconnected and Interdependent Projects
           Constructing a Continuous New Pipeline ............................8

          1.    Petitioners and Others Timely Alerted FERC
               to this Issue Long Before the Rehearing Request ...................13

          2.    TGP's Obvious Manipulation of the NEPA Process
               in the Timing of Its Project Applications Vitiates
               Any "Simultaneous Proposal Stage" Requirement ..................13

          3.    The Projects are Part of a Single Larger Project ......................21

a.    The TGP Projects Completing the Eastern Leg Lack Independent Utility..........................................21

b.    The Termini for These Pipeline Segments Were Determined by Factors Other than the End Points for Gas Delivery Contracts..................................24

c.    The 300 Line Upgrade Foreclosed the Alternative of Leaving the New Eastern Leg Line Incomplete.........25

d.    Economic Interdependence, Timing, and Geographic Proximity All Demonstrate the Need to Analyze the 300 Line Projects as a Single Large Plan ........................................................................26

4.    FERC Should Have Undertaken a Programmatic NEPA Analysis...................................................................29

B.    FERC Violated NEPA by Failing to Provide Meaningful Analysis of the Cumulative Impacts of the Interdependent and Interconnected Projects ..........................................................................30

1.    FERC Fails to Consider the Close Spatial and Temporal Relationship of the Projects in Assessing Cumulative Impacts on Soil Stability, Water, and Wetland Resources .......34

2.    FERC Fails to Address the Cumulative Impacts on Vegetation and Wildlife from the Long-Term Deforestation of a 100-Foot Wide Corridor ............................37

3.    FERC Fails to Analyze the Cumulative Impacts of the NSD and MPP in Light of their Proximity to 300 Line Upgrade Construction..................................39

C.    FERC Fails to Support its Finding that Habitat Loss Due to the NEUP Would Not Significantly Impact Wildlife..............40

D.    FERC Violated NEPA by Failing to Support the Assertion that Mitigation Measures Will Render Impacts Insignificant.............44

1.    FERC Failed to Support Its Finding that Collocation
      Mitigates Impacts to Wildlife to an Insignificant Level ...........46

2.    FERC Failed to Support Its Finding that
      the Cumulative Impact on Wetlands Would Be
      Mitigated to Insignificant Levels .............................................47

CONCLUSION .......................................................................................................50

# TABLE OF AUTHORITIES

## FERC Orders

131 FERC ¶ 61,140................................................................................3, 17

136 FERC ¶ 61,173............................................................................ 3, 15, 17

140 FERC ¶ 61,120................................................................................3, 15

## Cases

*Alpharma, Inc. v. Leavitt*, 460 F.3d 1 (D.C. Cir. 2006)..........................................32

*Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008).....................9

*Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008)..............................23

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)

...........................................................................................................................11

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685

    F.2d 678 (D.C. Cir. 1982).................................................................................45

*Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975) ......................................................11

*Citizen's Alert Regarding Environment v. U.S. Dep't. of Justice*, 1995 WL 748246

    (D.D.C. Dec. 8, 1995)........................................................................................11

*Citizens Against Rails-To-Trails v. Surface Transp. Bd.*, 267 F.3d 1144 (D.C. Cir.

    2001) ....................................................................................................................6

*City of Jersey City v. CONRAIL*, 668 F.3d 741 (D.C. Cir. 2012)............................6

*Coalition on Sensible Transportation v. Dole*, 826 F. 2d 60 (D.C. Cir. 1987) .......10
    (Authorities upon which we chiefly rely are marked with asterisks.)

*Conservation Society of Southern Vermont, Inc. v. Sec'y. of Transportation*, 508

F.2d 927 (2d Cir. 1974) ........................................................................11

*County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64 (D.D.C. 2008) .............16

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ...........................................11

*DOI v. FERC*, 952 F.2d 538 (D.C. Cir. 1992) .........................................................46

*Envtl. Def. Fund v. Marsh,* 651 F.2d 983 (5th Cir. 1981) .......................................14

*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996).......................5, 8

*Florida Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp. 2d

1298 (D. Fla. 2005)...............................................................................11

*FOE v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000).........................................5

*\*FOE v. United States Army Corps of Eng'rs*, 109 F. Supp. 2d 30 (D.D.C. 2000) 32

*Found. for North Am. Wild Sheep v. USDA,* 681 F.2d 1172 (9th Cir. 1982) .........41

*Found. on Educ. Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) .....................12

*Fund for Animals v. Clark*, 27 F. Supp. 2d 9 (D.D.C. 1998)..................... 10, 11, 27

*Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571 (D.C. Cir. 1999) ........................7

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir.  2002) ................................31

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257 (10th Cir. 2004) ...............44

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) .......................................9

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ...........................5

*\*Idaho v. Interstate Commerce Comm'n.*, 35 F.3d 585 (D.C. Cir. 1994) ..............36

*'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006) ...................12

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)...........................................................14

*Lujan v. DOW*, 504 U.S. 555 (1992) .......................................................................6

*Md. Conservation Council Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986) ..........15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..7

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996)............5

*Named Individual Members of the San Antonio Conservation Soc'y v. Tex. Hwy*

    *Dep't*, 446 F.2d 1013 (5th Cir. 1971)................................................................15

*Nat'l Committee for the New River v. FERC*, 373 F.3d 1323 (D.C. Cir. 2004)........7

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Com.*, 677 F.2d 883 (D.C. Cir. 1981)..30

*Nevada v. DOE*, 457 F.3d 78 (D.C. Cir. 2006).......................................................12

*North Carolina v. FAA*, 957 F.2d 1125 (4th Cir. 1992) ..........................................45

*NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988).....................................................30

*\*O'Reilly v. U.S. Army Corps of Eng'rs,* 477 F.3d 225 (5th Cir. 2007) ................14

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ..............8

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287

    (D.C. Cir. 1984)..............................................................................................16

*Sierra Club v. Van Antwerp*, 661 F.3d 1147 (D.C. Cir. 2011) .................................7

*\*Taxpayers Watchdog v. Stanley,* 819 F.2d 294 (D.C. Cir. 1987) .........................10

*Theo. Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010) .........23

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)....................................................11

*TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ...............................................30

*Town of Huntington v. Marsh*, 859 F.2d 1134 (2d Cir. 1988)...............................10

*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974) ...................................11

*Western North Carolina Alliance v. North Carolina Department of Transportation*, 312 F. Supp. 2d 765 (E.D. N.C. 2003)................... 11, 22, 25, 26

*Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000)....................................................................................21

## Regulations

*40 C.F.R. § 1508.25 ...............................................................................................8, 9

*40 C.F.R. § 1508.27 ............................................................................................. 10, 31

*40 C.F.R. § 1508.7 .................................................................................................31

40 C.F.R. § 1500.1(b) ...............................................................................................8

40 C.F.R. § 1500.2 ....................................................................................................8

40 C.F.R. § 1501.4 ....................................................................................................8

40 C.F.R. § 1508.9 ....................................................................................................8

**Statutes**

*15 U.S.C. § 717f(c)(1)(A) ........................................................1

*15 U.S.C. § 717r(a) ..............................................................1

*15 U.S.C. § 717r(b) ..............................................................1

*42 U.S.C. § 4332 ................................................................8

*5 U.S.C. § 706(2)(A) ............................................................7

# GLOSSARY

| | |
|---|---|
| 300LU | 300 Line Upgrade project |
| AD | Petitioners' Addendum |
| APA | Administrative Procedure Act |
| Certificate | Certificate of Public Necessity and Convenience |
| DRN | Petitioners Delaware Riverkeeper Network, New Jersey Highlands Coalition, and Sierra Club, New Jersey Chapter |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FWS | U.S. Fish and Wildlife Service |
| FONSI | Finding of No Significant Impact |
| JA | Joint Appendix |
| MPP | "MPP" pipeline project |
| NEPA | National Environmental Policy Act |
| NEUP | Northeast Upgrade Project |
| NGA | Natural Gas Act |
| NJDEP | New Jersey Department of Environmental Protection |
| NSD | Northeast Supply Diversification project |

| | |
|---|---|
| PADCNR | Pennsylvania Department of Conservation and Natural Resources |
| PCCD | Pike County Conservation District |
| Petitioners | Delaware Riverkeeper Network, New Jersey Highlands Coalition, and Sierra Club, New Jersey Chapter |
| R | Administrative Record as per Amended Certified Index |
| R1 at 5 | Record 1 at page 5 |
| R1 at P3 | Record 1 at paragraph 3 |
| TGP | Respondent-Intervenor Tennessee Gas Pipeline Co. |
| USACE | U.S. Army Corps of Engineers |

## JURISDICTIONAL STATEMENT

The Natural Gas Act (NGA) requires a Certificate of Public Necessity and Convenience ("certificate") from the Federal Energy Regulatory Commission (FERC) for constructing facilities for the transportation of gas. 15 U.S.C. § 717f(c)(1)(A). Any person aggrieved by a FERC order granting a certificate may seek rehearing within 30 days of the order's issuance. 15 U.S.C. § 717r(a). The NGA gives this Court jurisdiction to review FERC orders approving certificates, but limits review to objections "urged before [FERC] in [an] application for rehearing" and denied in an order on the rehearing request. 15 U.S.C. § 717r(b). Review must be sought within 60 days of denial. *Id.*

Delaware Riverkeeper Network, New Jersey Highlands Coalition and Sierra Club, New Jersey Chapter (Petitioners or DRN) urged the issues raised here in a June 28, 2012 rehearing request, submitted within 30 days of the May 29, 2012 order granting the Certificate in question. R.574 at 8-60, **JA __**. FERC denied the rehearing request on January 11, 2013. R.754 at PP29-103, **JA __-__**. Petitioners filed a petition for review on January 22, 2013, 11 days after FERC's final decision.  Because Petitioners timely submitted the issues raised here to FERC, were denied rehearing, and timely petitioned for review, this Court has jurisdiction.

1

## STATEMENT OF ISSUES

1.    Did FERC violate the National Environmental Policy Act (NEPA) by unlawfully segmenting its environmental review of interdependent and interconnected projects constructing a new pipeline parallel to the 300 Line's Eastern Leg?

2.    Did FERC violate NEPA by failing to provide a meaningful analysis of the cumulative impacts of these projects to show that such impacts would be insignificant?

3.    Did FERC violate NEPA by failing to show that impacts on wildlife due to habitat loss would be insignificant?

4.    Did FERC violate NEPA by failing to show that mitigation measures would reduce impacts to wildlife and wetlands to insignificant levels?

## STATUTES AND REGULATIONS

The Addendum presents pertinent statutory and regulatory provisions.

## STATEMENT OF FACTS

On March 31, 2011, Tennessee Gas Pipeline (TGP) submitted its certificate application for the NEUP. R.479 at P1, **JA __**. On November 21, 2011, FERC issued an Environmental Assessment (EA) for the NEUP that recommended a Finding of No Significant Impact (FONSI). R.350 at 4-1, **JA __**. Petitioners submitted timely comments. *See* R.379, **JA __**. On May, 29, 2012, FERC issued an

2

order including a FONSI and certificate approval for the NEUP. R.479 at PP43,

204, **JA __, __**.

The NEUP is one of at least four projects TGP has launched in the last three

years to add a new 30-inch diameter pipeline beside the Eastern Leg of the 300

Line, an older 24-inch diameter pipeline delivering gas to the Mahwah Metering

Station in New Jersey. The geographic interconnectedness of these projects is

illustrated in AD16-18.

First, the 300 Line Upgrade (300LU) added new compressors and 127.4

miles of new pipeline in eight non-contiguous sections ("loops"). 131 FERC ¶

61,140 at PP3-6 (May 14, 2010). *See also* R.479 at P4, **JA __**.

Second, the Northeast Supply Diversification (NSD) project added 6.8 miles

in a gap left by the 300LU. 136 FERC ¶ 61,173 at P17 (Sept. 15, 2011).

Third, at issue here is the NEUP, which will compressors as well as 40.3

miles of pipeline in five loops that bridge gaps left by the 300LU. R.479 at P5, **JA

__**.

Finally, the MPP will add 7.9 miles of pipeline in a gap between a loop

added by the 300LU and a compressor station upgraded by the 300LU. 140 FERC

¶ 61,120 at P3 (Aug. 9, 2012).

Pursuant to NEPA, FERC issued a separate EA and FONSI for each of these

four projects.

3

An astounding number of environmentally sensitive areas and public lands will be degraded by the NEUP. It will cut through state game lands and cross 50 acres of wetlands and dozens of high quality and exceptional value waterbodies, including the Susquehanna River and the Delaware River, a National Wild and Scenic River. It will scar one of the most well-preserved forests in Pike County, PA as well as the New Jersey Highlands, recognized by the federal Highlands Conservation Act for its vital resources. The NEUP will denude miles of wooded mountains and pastoral landscapes for its right-of-way (ROW) and access roads. A total of 265 acres of mature forest will be cleared, 80 acres of which will remain deforested permanently, including acres of wetlands. *See* R.350 at 2-13, 2-19, 2-25, 2-28, 2-36, 2-71 to 2-80, **JA __, __, __, __, __, __to__**. Construction of the new 300 Line Eastern Leg as a whole will result in 628 acres of permanently deforested new ROW. Hundreds of additional acres of mature forest cleared for "temporary" construction workspace will require decades to regenerate. R.574 at 29,44, **JA __, __**.

## SUMMARY OF ARGUMENT

FERC facilitated the unlawful segmentation of TGP's four projects composing the new 300 Line Eastern Leg by ignoring evidence before it showing that the projects were functionally interdependent and that TGP misrepresented the certainty of its future plans to manipulate the NEPA review process. FERC's

failure to consider the projects in a programmatic NEPA document is not cured by its cursory and generic treatment of other pipeline projects in the NEUP EA. The NEUP EA fails to take the mandatory "hard look" at cumulative impacts on wetlands and wildlife because it relies on conclusory assertions rather than data and reasoned analysis, a defect that also characterizes its assessment of the NEUP's individual wildlife impacts. Finally, FERC violated NEPA by failing to demonstrate that mitigation would reduce impacts to wildlife and wetlands to insignificant levels.

## STANDING

Petitioners have standing as not-for-profit environmental protection organizations and represent members who use and enjoy the specific geographic areas to be affected by construction and operation of the NEUP, which FERC certificated premised on an unlawful EA and FONSI. *See* AD86-111; *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43(1977). Construction of the 300LU and NEUP has harmed and will continue to harm Petitioners' members' protected recreational and aesthetic interests in the environment, constituting injury in fact within the zone of interests of NEPA. *See* AD86-135; *FOE v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 180-81 (2000); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996); *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) ("Bentsen").

5

FERC's NEPA violations in segmenting its analysis of the Eastern Leg Projects and in failing to take a hard look at the cumulative, wildlife, and wetlands impacts have made it substantially more likely that Petitioners' members will suffer the harms their declarations describe, demonstrating causation. *See Bentsen*, 94 F.3d at 669.

These harms would be redressed by this Court remanding the challenged orders, to ensure that conditions imposed by FERC on the NEUP's construction, site restoration, and operation are fully informed by a proper NEPA analysis. *See Lujan v. DOW*, 504 U.S. 555, 572 n.7 (1992) (discussing relaxed redressibility requirement for parties invoking procedural rights); *City of Jersey City v. CONRAIL*, 668 F.3d 741, 745 (D.C. Cir. 2012) (injury from increased risk of environmental harm redressable by remand requiring review in compliance with NEPA where review could inform conditions imposed on underlying action).

## ARGUMENT

### I.    Standard of Review

An agency's interpretations of NEPA are not entitled to deference, and are reviewed de novo, because NEPA's mandate addresses *all* federal agencies. *See Citizens Against Rails-To-Trails v. Surface Transp. Bd*., 267 F.3d 1144, 1150-1151 (D.C. Cir. 2001). Agency action under the NGA and NEPA is reviewed pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, whereby courts set

aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Nat'l Committee for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (applying "arbitrary and capricious" standard in NEPA challenge to FERC certificate).

While this standard is deferential, "[d]eference . . . does not mean blind obedience." *Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571, 580 (D.C. Cir. 1999). Where an agency "entirely failed to consider an important aspect of the problem," or failed to consider factors required by law, the action must be set aside. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In reviewing the adequacy of an EA and FONSI, a court determines "whether the agency (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or EA], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1153-54 (D.C. Cir. 2011) ("Van Antwerp").

## II.    NEPA's Statutory and Regulatory Scheme

NEPA requires an Environmental Impact Statement  (EIS) for proposed

"major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). When scoping the range of actions to include in an EIS, agencies must consider whether proposed actions are connected, cumulative, or similar. 40 C.F.R. § 1508.25(a)(1)-(3). An agency may avoid preparation of an EIS by preparing an EA supporting a FONSI, or by determining the proposed action is not a major Federal action significantly affecting the environment. 40 C.F.R. §§ 1501.4(e)(1), 1508.9.

NEPA requires federal agencies to take environmental considerations into account "to the fullest extent possible." 42 U.S.C. § 4332; 40 C.F.R. § 1500.2; *Bentsen*, 94 F.3d at 684. NEPA ensures that a federal agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and "guarantee[s] that the relevant information [on impacts] will be made available to the larger audience." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); 40 C.F.R. § 1500.1(b).

## III.  FERC Failed to Evaluate the Impacts of the NEUP in Accordance with its NEPA Obligations

### A.  FERC Unlawfully Segmented its Review of Interconnected and Interdependent Projects Constructing a Continuous New Pipeline

FERC violated NEPA by segmenting review of TGP's new pipeline into four separate projects. These projects are part of a unified whole with functional

8

interdependence, economic interdependence, common timing, and geographic proximity. The segmented projects have no independent utility, nor were the segment locations for each project determined by the delivery contracts justifying them.  In short, TGP's new 300 Line pipeline from central Pennsylvania to the Mahwah Metering Station is one project divided into four segments that have significant adverse environmental impacts and should have been evaluated in a programmatic NEPA document.

An agency should prepare a single programmatic EIS for actions that are "connected," "cumulative," or "similar," such that their environmental effects are best considered in a single impact statement. *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1032 (D.C. Cir. 2008); 40 C.F.R. § 1508.25(a). "Actions are 'connected' or 'closely related' if they: '(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.'" *Hammond v. Norton*, 370 F. Supp. 2d 226, 247 (D.D.C. 2005) (quoting 40 C.F.R. § 1508.25(a)(1)). Similar actions have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. *Id*. at 246; 40 C.F.R. § 1508.25(a)(3).

"Piecemealing" or "segmentation" is the unlawful practice whereby a project

9

proponent avoids the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects. *Taxpayers Watchdog v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) ("Taxpayers"). Federal agencies may not evade their responsibilities under NEPA by "artificially dividing a major federal action into smaller components, each without a 'significant' impact." *Coal. on Sensible Transp. v. Dole*, 826 F. 2d 60, 68 (D.C. Cir. 1987). *See also* 40 C.F.R. § 1508.27(b)(7).

The general rule is that segmentation should be "avoided in order to insure that interrelated projects, the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir. 1988). Without this rule, developers and agencies could "unreasonably restrict the scope of environmental review." *Fund for Animals v. Clark*, 27 F. Supp. 2d 9, 16 (D.D.C. 1998) ("Fund").

To determine whether a project has been unlawfully segmented, "courts have considered such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives[.]" *Taxpayers*, 819 F.2d at 298. Courts consider "independent utility" in concert with other factors, including economic

10

interdependence, timing, and geographic proximity.[1]

> 1.      Petitioners and Others Timely Alerted FERC to TGP's
>          Deliberate Segmentation Long Before the Rehearing Request

FERC's assertion that Petitioners' comments raised the claim of

segmentation about the 300LU, but not the two other projects completing the new

300 Line Eastern Leg, R.754 at P38, **JA __**, ignores that Petitioners and other

parties timely alerted FERC that the NEUP was part of TGP's overarching plan to

complete the entire Eastern Leg, *including but not limited to* the 300LU, long

before Petitioners raised the claim on rehearing.  Parties "challenging an agency's

compliance with NEPA must structure their participation so that it alerts the

agency to the parties' position and contentions, in order to allow the agency to give

the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S.

752, 764 (2004) ("Public Citizen")(internal quotation and alteration omitted).

However, "review may be had if an issue was raised at the administrative level by

a party other than the petitioner." *Nevada v. DOE*, 457 F.3d 78, 88 (D.C. Cir.

---

[1] *See, e.g., Conservation Soc'y of S. Vt., Inc. v. Sec'y of Transp.*, 508 F.2d 927 (2d Cir. 1974); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir. 1974); *Cady v. Morton*, 527 F.2d 786, 795 (9th Cir. 1975); *Thomas v. Peterson*, 753 F.2d 754, 757 (9th Cir. 1985); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214-15 (9th Cir. 1998); *Citizen's Alert Regarding Env't v. U.S. Dep't. of Justice*, 1995 WL 748246, *8 (D.D.C. Dec. 8, 1995); *Fund*, 27 F. Supp. 2d at 12-13; *W.N.C. Alliance v. N.C. Dep't of Transp.*, 312 F. Supp. 2d 765 (E.D. N.C. 2003); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1315 (D. Fla. 2005).

2006). Furthermore, because the need to raise a claim before the agency is premised on fairness, failure to raise a claim in comments is not fatal where no unfairness would result to the agency. *Found. on Educ. Trends v. Heckler*, 756 F.2d 143, 156 (D.C. Cir. 1985); *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1091-1093 (9th Cir. 2006) (where agency had independent knowledge of issue, failure to raise to agency not fatal).

Prior to the issuance of the NEUP EA, Petitioners, the Pennsylvania Department of Conservation and Natural Resources (PADCNR), and private landowners all informed FERC that its analysis of the NEUP was improperly segmented from that of other TGP projects building out the 300 Line's Eastern Leg; Pike County Conservation District (PCCD) raised the issue in its EA comments. *See* R.74 at 13, **JA __;** R.114 at 7, **JA __;** R.241 at 2, **JA __** ; R.381 at 3, **JA __**.

Petitioners' timely November 2010 scoping comments stated:

> [T]he 300 Line Project and the Project at issue here *are all part of a larger development plan* . . . TGP must not be allowed to circumvent heightened environmental scrutiny by segmenting their upgrades . . .

R.74 at 13, **JA __**(emphasis added). Scoping comments by the PADCNR Bureau of Forestry stated:

> The Bureau of Forestry previously urged FERC *to evaluate the entire corridor parallel to the existing TGP line* when the 300 Loop [sic] was being considered. Now, less than three years later, the situation, as suggested by the Bureau [the joining of the loops into a continuous

12

second line], is becoming reality. FERC has demonstrated that their position on building pipelines to subscribed capacity in this region is antiquated and in need of serious reconsideration.

R.114 at 7, **JA** ___ (emphasis added); AD78 (emphasis added). PCCD's EA

comments stated:

> Clearly the current project [NEUP] is related to the previously approved 300-line project *and it appears that there may be additional related upgrades proposed in the near future*. We question why FERC is allowing these projects to be submitted and approved in a piecemeal fashion without a full analysis of cumulative impacts and development of a full environmental impact statement.

R.381 at 3, **JA** ___ (emphasis added). Thus, throughout the NEPA process,

Petitioners and others repeatedly flagged that both the NEUP and 300LU were part

of TGP's larger project to build out a new pipeline along the 300 Line.

      2.    TGP's Obvious Manipulation of the NEPA Process in the Timing of its Project Applications Vitiates Any "Simultaneous Proposal Stage" Requirement

Because FERC had ample reason to know that TGP was timing its project

applications to manipulate the NEPA process, the timing of the formal certificate

applications for the four projects does not preclude a finding that the NEPA review

was unlawfully segmented. FERC asserts that, because the 300LU was certificated

two months before TGP submitted its pre-filing applications for the NEUP and

NSD, the projects were not simultaneously at the proposal phase and therefore

need not have been considered in one NEPA document. *See* R.754 at PP40, 44, **JA**

___, ___. This argument ignores the evidence showing that, at the time the 300LU

13

application was pending, TGP's future completion of the remaining gaps in the new Eastern Leg had become a certainty. Furthermore, information TGP presented to FERC in its 300LU application shows that the completion of the rest of the line was imminent, and should have alerted FERC that a comprehensive NEPA review of the Eastern Leg as a whole was required.

Although courts have interpreted *Kleppe v. Sierra Club*, 427 U.S. 390 (1976)*,* to mean that a NEPA analysis *usually* need only consider projects that have at least reached the proposal stage, "a court [may] prohibit segmentation or require a comprehensive EIS for two projects, even when one is not yet proposed, if an agency has egregiously or arbitrarily violated the underlying purpose of NEPA." *O'Reilly v. U.S. Army Corps of Eng'rs,* 477 F.3d 225, 236- 237 (5th Cir. 2007) (quoting *Envtl. Def. Fund v. Marsh,* 651 F.2d 983, 999 n.19 (5th Cir. 1981)). An "egregious or arbitrary" violation occurs where the proposal of an interdependent part of a larger project has been delayed to manipulate the NEPA review process, such as where the proponent divides

> a single highway project to allow construction of two "end segments" leading up to the very borders of a treasured park, supposedly postponing the "middle segment" for "further study". . . where [c]onstruction of the two end segments would have effectively eliminated any alternatives to using park land for the middle segment.

*Envtl. Def. Fund v. Marsh*, 651 F.2d at 999 n.19 (discussing *Named Individual Members of the San Antonio Conservation Soc'y v. Tex. Hwy Dep't*, 446 F.2d 1013

(5th Cir. 1971)). *Cf. Md. Conservation Council Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) (requiring EIS for whole highway where state delayed portion requiring federal authorization so that parts entering and exiting park would be complete before NEPA review for part piercing park).

Here, the NSD, NEUP, and MPP segments were in the proposal stage at the same time. The application process for the projects overlapped such that the NSD and MPP were both pending before FERC while the NEUP application was pending. On March 31, 2011, when TGP formally filed its certificate application for the NEUP, its application for the NSD (filed Nov. 12, 2010) was still pending before FERC. The EA for the NSD was not issued for public comment until June 30, 2011. R.479 at P1, **JA __**; 136 FERC ¶ 61,173 at PP1, 57. The formal certificate application for the MPP was filed on Dec. 9, 2011, within the 30-day public comment period for the NEUP EA, which was issued for comment on Nov. 21, 2011. R.479 at P63, **JA __**; 140 FERC ¶ 61,120 at P1. Furthermore, the non-binding open season for the MPP ended on Sept. 8, 2010, one month before TGP filed its formal Certificate application for the NSD and six months before TGP filed its formal application for the NEUP. R.479 at P1, **JA __**; 136 FERC ¶ 61,173 at P1; 140 FERC ¶61,120 at P5.

As shown below, documents from FERC's NSD and 300LU public dockets at the time it issued the NEUP EA demonstrate that FERC ignored evidence that

TGP divided its 300 Line projects to manipulate the NEPA process. *See* AD33-79.

Because these documents were clearly before FERC prior to the NEUP Order, are

relevant to its decision, and are adverse to FERC's position regarding

segmentation, they may be considered by this Court. *Cnty. of San Miguel v.*

*Kempthorne*, 587 F. Supp. 2d 64, 72 (D.D.C. 2008) (citing *San Luis Obispo*

*Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1327 (D.C. Cir.

1984), aff'd 789 F.2d 26 (1986)).

    In March 2010, for example, PADCNR alerted FERC to the possibility that

TGP was segmenting its 300 Line Eastern Leg projects:

> Currently, Tennessee Gas's proposed looping segments largely avoid
> State Forest lands . . . However, in the future, should Tennessee Gas
> want to add even more storage capacity to its line through the
> construction of additional looping segments, *it would be logical for*
> *the company to propose to join already-looped segments together,*
> *essentially resulting in a second continuous pipeline which would*
> *parallel the existing line* . . . [This would represent] a 440% increase
> in the infrastructure impact to State Forest lands over the current
> project proposal and *begs the question of whether or not State Forest*
> *land are strategically being avoided in the looping request in the*
> *hopes of receiving a favorable response from FERC when capacity*
> *needs to be increased at some latter point in time*.

AD78 (emphasis added).

    TGP's docket submissions confirm that its plans to complete the NEUP and

NSD projects had become definite *months before* FERC approved the 300LU

certificate. In July 2009, prior to development of the 300LU EA, TGP informed

FERC that it was meeting with shippers to confirm the significant interest

expressed for additional capacity during a non-binding "open season,"[2] and, depending on the outcome of these discussions, would likely seek additional certificates in 2010 to complete the gaps left by the 300LU to form a continuous second line. *See* AD58-59. TGP began its open seasons to seek shipping contracts for the NSD and NEUP projects before FERC issued the EA for the 300LU on February 25, 2010. 131 FERC ¶ 61,140 at P47; R.479 at P8, **JA __**; 136 FERC ¶ 61,173 at PP6, 10. The open season for these two projects, resulting in binding commitments on TGP's part to develop the NEUP and NSD, ended in March 2010, before the close of the 30 day public comment period on the 300LU EA. *Id*. At that point, which was roughly two months before the certificate approval for the 300LU, further development on the 300 Line was a certainty from TGP's perspective.

At the time that TGP submitted its 300LU application, it knew that if it ever contracted to provide additional gas delivery capacity to Mahwah, it would need to add new pipeline loops along the Eastern Leg, including a loop crossing the Delaware River. *See* R.350 at 3-3, **JA __**. The NEUP EA explains that, to provide the additional capacity contracted for during the NEUP open season, TGP would have to bridge the gap left by the 300LU by adding a new loop crossing the

---

[2] During "open seasons," pipeline owners establish the demand for new pipeline facilities by seeking contracts with new gas shippers and showing that the contracts cannot be met by release of capacity from existing shipper-customers.

Delaware River. *See id.* According to TGP's own analysis of its system, gas velocities in the original 24-inch pipe crossing the Delaware River would "threaten pipeline integrity and safety" if TGP attempted to provide the additional gas delivery capacity associated with the NEUP contracts *without* crossing the Delaware with a new pipeline loop. *See id.*

TGP documents for the NEUP and NSD certificate applications also concede that, to provide any additional gas delivery capacity above the amount available after the 300LU project, TGP would have to build more pipeline loops along the Eastern Leg in the gaps left by the 300LU. The alternative of increasing gas delivery by increasing compressor capacity only (pushing gas through existing pipes faster) would result in unsafe gas velocities in the unlooped sections of the original 24 inch pipeline. *See* R.350 at 3-2, 3-3, **JA __, __**; R.155, RR10 at 10-8, **JA __**; AD72. These statements show that, at the time the 300LU application was pending, TGP knew, based on the physical properties of its pipeline system, that the new binding commitments it entered into in March 2010 would unavoidably require constructing new pipeline segments between the loops added by the 300LU.

On a distinct but related point, TGP's Critical Energy Infrastructure Information (CEII) shows that constructing the new pipeline loops added by the 300LU actually foreclosed the option of leaving the rest of the Eastern Leg

unlooped, *even if TGP never attempted to add gas delivery capacity beyond the amount available after completion of the 300LU project*. TGP's CEII data shows that, once the 300LU loops were added, gas velocities in unlooped sections of the aging 24-inch pipeline would exceed the 40 ft/sec velocity that TGP has consistently asserted[3] is the threshold for long-term safe operation. *See* AD22-24. To avoid long-term safety issues related to erosion of the aging pipeline due to velocities exceeding the 40 ft/sec threshold by 20-70%, TGP would have to complete the looping of the rest of the Eastern Leg. *Id*. Thus, based on its own CEII, TGP knew at the time that it applied for the 300LU certificate that it would have to complete the entire Eastern Leg before dangers related to pipeline erosion[4] could manifest.

Finally, TGP expressly selected the locations of the non-contiguous loops added by the 300LU project to leave the most environmentally sensitive water-body crossings, such as the Susquehanna River and Monksville Reservoir Crossings, for later projects. In a December 2008 draft environmental resource report for the 300LU, TGP discussed how it chose to avoid crossing the Susquehanna River because of the environmental sensitivity of that steep-sloped

---

[3] *See, e.g,* R.350 at 3-2, 3-3, **JA__, __** (stating "gas velocity significantly above     .
. . TGP's recommended maximum design velocity of approximately 40 feet per second . . . could compromise the pipeline's integrity and safety").
[4] Long-term operation at erosional velocities causes thinning of the pipe wall that can lead to rupture. R.574 at 72 (Exhibit B at 4), **JA__**.

area. In lieu of crossing that area, TGP proposed to add pipeline segments in the

300LU that would *lead up to* the Susquehanna River from both the east and west

sides. *See* AD46. TGP subsequently made the Susquehanna River crossing part of

the NEUP application. *See* R.350 at 2-13, **JA __**.

Even more blatantly, TGP's formal application for the 300LU proposed a

pipeline section crossing the Monksville Reservoir. TGP withdrew that section

from its 300LU certificate application, such that the new segments added by the

300LU stopped immediately west of the Reservoir instead of crossing it. *See*

AD61-63. TGP then re-proposed the section crossing the Reservoir as part of the

NEUP. *See* R.350 at 2-13, **JA __**.

In light of TGP's certainty about the imminent completion of the later

projects, this selective delay in proposing to construct the middle loops through

environmentally sensitive areas until such time as there would be no alternative but

to complete the connections between pipeline segments manipulated the NEPA

review process. *Cf. Envtl. Def. Fund v. Marsh*, 651 F.2d at 999 n.19.

Thus, while the 300LU application was pending, TGP's active pursuit of

contracts for additional capacity crystallized into certainty that new pipeline

segments would be added in the gaps remaining after completion of the 300LU

construction, such as the Susquehanna and Monksville crossings, and that the

environmentally difficult crossing at the Delaware River would be unavoidable.

Because TGP knew that it would imminently apply for certificates for projects bridging the gaps left by the 300LU over environmentally sensitive areas, it manipulated the NEPA environmental review process by understating the certainty of these future projects when it filed for the 300LU Certificate.

FERC facilitated this egregious circumvention of NEPA by failing to scrutinize TGP's claims regarding the probability of future development in light of: (1) PADCNR comments that TGP was manipulating the review process, (2) TGP's active pursuit of new contracts for the same delivery point, and (3) the CEII that TGP provided to FERC. *See* R.114 at 7, **JA __**; AD78.  Because TGP obviously manipulated the timing and content of its formal applications to affect the outcome of the NEPA review process, the timing of those applications cannot bar a claim of unlawful segmentation.

        3.      The Projects are Part of a Single Larger Project

                a.      The TGP Projects Completing the Eastern Leg Lack Independent Utility

A project lacks "independent utility" if it could not function or would not have been constructed in the absence of another project. *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1118 (9th Cir. 2000). *See also W. N.C. Alliance v. N.C. DOT*, 312 F. Supp. 2d 765, 774-775 (E.D.N.C. 2003) ("Alliance") (project widening highway section lacked independent utility because it would leave a "bottleneck" of narrow highway to north, such that traffic

21

congestion between the termini of the project would be worsened until construction of later project widening bottleneck section).

As discussed above, TGP's CEII shows that, due to long-term safety concerns, the 300LU could not have been constructed unless the rest of the Eastern Leg was looped by future projects. To prevent gas velocities in the older 24-inch pipeline from exceeding the safe design velocity of 40 ft/sec, the entire Eastern Leg had to be looped with a new second pipeline. Consequently, the 300LU depended on the later NEUP, NSD, and MPP projects being completed to ensure its own long-term safety and functionality. Thus, like the highway section in *Alliance*, the 300LU project segment depended on later segment construction for its functionality. *See* 312 F. Supp. 2d at 774-775.

FERC responds by asserting that its staff "confirmed that the design of each project was appropriate to meet the specified contractual demand." R.754 at P43, **JA __**. Yet this bald assertion notwithstanding, the record is entirely devoid of evidence showing that FERC conducted an independent staff analysis or drew any of its own conclusions regarding gas velocity. Petitioners include in the Addendum an explanation of TGP CEII by pipeline engineer Richard Kuprewicz that exposes the absence of any analogous analysis by FERC on the record. *See* AD22-27.

This Circuit has long acknowledged that when the record is "bare" on an issue, "it may sometimes be appropriate to resort to extra-record information to

22

determine whether an administrative record is deficient." *Theo. Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (internal quotations omitted); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (acknowledging exception where court needed background information to determine whether agency considered all relevant factors). Because the Kuprewicz report demonstrates the type of analysis that is absent from FERC's record, it is admissible to show that FERC failed to consider whether this long-term pipeline integrity issue should affect its decision that the projects were functionally independent.

The functional interdependence of the projects is also shown by the fact that the compressor stations added as part of the NEUP and 300LU projects were designed to provide horsepower to maintain flow in the new pipeline to be added in the MPP and NSD projects (which add pipeline but not compressor power). *See* R.574 at 16-17, Ex. B at 6, **JA __-__, __**; AD23, AD25. Further, TGP concedes that the NEUP was designed to "power up" certain pipeline sections added by the 300LU. R.155, Application at 13, **JA __**. Consequently, the NSD and MPP would not be able to supply their contracted-for capacities if the 300LU and NEUP projects had never been undertaken. Similarly, part of the capacity to be provided by the NEUP relies on increasing the amount of gas pushed through pipelines

added by the 300LU. If the 300LU had not been built, the NEUP facilities would

not be able to provide their contracted-for capacity increase.

TGP's earlier 300 Line projects included infrastructure sized to serve the

later projects. FERC's only response on this issue is to state that the design of a

project in light of other past or future projects merely "reflects engineering

principles." R.754 at P41, **JA __**. Tellingly, FERC can point to nothing on the

record demonstrating its independent analysis of any "engineering principles" that

would show that any of these projects could operate independently. Even more

problematically, FERC apparently believes its rules limiting the extent to which

applicants may "over-build" to accommodate future expansion excuse it from

NEPA's requirements to review functionally interdependent projects together.

> **b.** The Termini for These Pipeline Segments Were
> Determined by Factors Other than the End Points for
> Gas Delivery Contracts

As shown by the alternatives analyses in the 300LU, NEUP, and NSD

project EAs, when pipeline owners add new loops along a larger pipeline corridor

to increase gas delivery capacity to the end point of that corridor, the location of

the start and end points of individual loops is not fixed by the contracted-for

quantity. *See, e.g.*, R.350 at 3-2, **JA __** (increased capacity could be achieved by

building 42 miles of pipeline loop in addition to the planned 40.3 miles of loop

instead of increasing compressor power). Where the contracted-for quantity could

24

be satisfied by adding new loops and compressors in a variety of configurations, pipeline owners add loops in locations based on factors including cost and difficulty of construction, environmental considerations, short- and long-term safety, and avoiding the need to acquire additional property rights. *See, e.g.,* R.155, RR10 at 10-7, **JA __**.

As shown above, in contracting to provide additional transmission capacity to the Mahwah Metering Station, TGP's selection of the start and end points for the eight new loops of the 300LU left deliberately difficult and controversial water-body crossings for later projects. Because the selection of the termini for each segment did not turn on the projects' individual contract, the existence of that separate contract cannot by itself establish the independence of the project from the expansion of capacity on the Eastern Leg as a whole.

> c.  The 300 Line Upgrade Foreclosed the Alternative of Leaving the New Eastern Leg Line Incomplete

A project may be impermissibly segmented from future projects if it eliminates the "no build" alternatives for those future projects. *See Alliance*, 312 F. Supp. 2d at 775 (project that would exacerbate traffic due to existing bottleneck foreclosed no build option for future widening of bottleneck). The 300LU made completion of the Eastern Leg inevitable. As shown above, once TGP completed the 300LU segments and began shipping additional gas under contracts for that project, gas velocities in the remaining unlooped segments along the Eastern Leg

began substantially to exceed the 40 ft/sec maximum velocity, increasing the long-term potential for pipeline failure due to increased erosion. Consequently, completion of the 300LU irretrievably committed TGP to completing the entire Eastern Leg to continue to provide the capacities it had agreed to in contracts justifying the 300LU. As in *Alliance*, *see id*., the 300LU eliminated the option of no further future construction by creating a problem that would necessitate future expansions. Furthermore, as shown above, by TGP's own admission, the construction of the 300LU created a situation where the crossing of the Delaware River would be unavoidable if TGP ever entered into contracts to provide additional capacity.

> d.    Economic Interdependence, Timing, and Geographic Proximity All Demonstrate the Need to Analyze the 300 Line Projects as a Single Large Plan

TGP's FERC filings concede that the 300 Line projects depend on each other economically. In the 2008 shipping agreement supporting the need for the 300LU, TGP and the shipper specifically agreed that, if TGP sought a certificate to construct further new facilities on the Eastern Leg within four years, TGP would seek a reduction of rates for the shipper. *See* R.479 at P24, **JA __**; AD68-69. According to FERC, TGP "explains that the parties agreed to this negotiated rate adjustment in recognition that Tennessee would likely be able to construct a

subsequent project (such as the Northeast Upgrade Project) at a lower cost than

would have been possible without the 300 Line Project." R.479 at P24, **JA __**.

Predictably, in seeking the NEUP Certificate, TGP asked FERC to adjust the

rates for the two projects to reflect the fact that the NEUP shippers would benefit

from the 300LU facilities because those facilities, in TGP's view, lowered the

marginal cost of adding further capacity. R.479 at P22-24, **JA __-__**. Also, because

the precedent agreement supporting the 300LU included as part of the basis for the

bargain a provision that rates would be lowered upon construction of the NEUP

facilities, TGP's construction of the 300LU relied on the *prospect* of constructing

the NEUP, and was thus economically dependent on the NEUP.

 "Common timing" also provides a basis for determining whether to evaluate

the environmental consequences of two projects together. 40 C.F.R. §

1508.25(a)(3). *See also Fund*, 27 F. Supp. 2d at 13 ("if agency actions are similar

in that they share common timing . . . such actions should also be addressed in the

same environmental document so as to assess adequately their combined

impacts"). The common timing of these projects is shown by the overlapping of

the restoration phase of earlier projects with the start of construction activities on

subsequent projects, as well as by the overlap of the project planning and

applications.

Post-construction restoration of the 300LU sites continued through at least October 2012, such that the NSD was built before 300LU restoration was complete. *See* AD82-84; R.726 at 1, **JA __**; R.350 at 2-124, **JA __**. Construction activities for the NEUP were authorized to begin in January 2013, only three months after TGP last addressed chronic soil stabilization failures associated with the 300LU. *Id*. Also, because the actual restoration of mature forests cleared by the projects will not take place for decades, the reversion and recovery periods following construction of the projects will occur during the same time span. *See* R.378 at 2, **JA __**. Finally, TGP's planning for the projects overlapped closely in time. As shown above, TGP entered into contracts for the NSD and NEUP months before approval of 300 Line Upgrade Certificate, and TGP filed its MPP Certificate application approximately two weeks after the issuance of the NEUP EA.

Geographic proximity is another factor determining whether projects should be evaluated together. *See* 40 C.F.R. § 1508.25(a)(3); *Fund*, 27 F. Supp. 2d at 9 (citing §1508.25(a)(3) to require EIS for projects that "all [took] place in the same geographic area."). The common geography of these projects is shown by the fact that the construction of the pipeline segments added by the NEUP, NSD, and MPP all take place immediately adjacent to construction areas where the 300LU added pipeline loops or facilities that physically connect to the NEUP, NSD, and MPP

28

additions to form a continuous new pipeline. *See* AD16-18. Thus, the same sub-watersheds affected by increased sediment runoff and hydrological changes resulting from tree-clearing and trenching during the 300LU have been or will be disturbed again by sediment loading from the NEUP, NSD or MPP. Similarly, the same localized wildlife deprived of forest habitat by tree-clearing during the 300LU were or will be deprived of additional habitat during the clearing associated with the NEUP, NSD or MPP projects.

4.  FERC Should Have Undertaken a Programmatic NEPA Analysis

FERC asserts that, because the 300LU and NSD have been built already, an EIS encompassing all four projects is not required because FERC cannot undo what has been done and an EIS would serve no purpose. R.754 at P48, **JA __** (citing *Public Citizen*, 541 U.S. at 767- 768). This argument is specious. First, *Public Citizen* addressed a situation where the agency in question *a priori* lacked statutory authority to prevent the impacts in question, not a situation where the agency deprived itself of power to prevent harm by its failure to address a project proponent's attempt to circumvent NEPA. Second, a comprehensive NEPA review of the Eastern Leg upgrade as a whole could still affect future determinations within FERC's authority about how construction, including mitigation and restoration, of the NEUP and MPP should take place. The proper question here is whether a NEPA document including those projects would inform "decisions [that]

29

are yet to be made" or "decisions [that], although already made, remain open to revision." *Nat'l Wildlife Fed'n v. Appalachian Reg'l Com.*, 677 F.2d 883, 892 (D.C. Cir. 1981) (internal quotation omitted).

FERC also insinuates that no programmatic review is needed because the "cumulative impacts" section of the NEUP EA comprehensively addressed the impacts of the 300LU, NEUP, and NSD. *See* R.754 at P45. As shown below, the NEUP EA is devoid of any specific analysis of the aggregate and synergistic impacts of the other Eastern Leg projects, and is otherwise defective for its reliance on conclusory assertions unsupported by facts or analysis.

In summary, because construction of the 300LU necessitated completion of the entire new Eastern Leg, which encompassed a series of closely-timed, interconnected projects in a single geographic corridor that relied on each other for their physical functionality and safety and economic viability, FERC violated NEPA by failing to evaluate the impact of TGP's Eastern Leg projects as a whole rather than in segmented parts dictated by TGP's manipulation of the review process.

B.    FERC Violated NEPA Failing to Provide Meaningful Analysis of the Cumulative Impacts of the Interdependent and Interconnected Projects

NEPA requires "agencies to consider the cumulative impacts of proposed actions." *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) ("Hodel"). *See also TOMAC v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). An agency must analyze

30

the impact of a proposed project in light of that project's interaction with the effects of "past, current, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*. A finding of "[s]ignificance cannot be avoided by terming an action temporary." 40 C.F.R. § 1508.27(b)(7). "[A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions--past, present, and proposed, and reasonably foreseeable--that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002). NEPA requires such an analysis because "[e]ven a slight increase in adverse conditions . . . may sometimes threaten harm that is significant . . . may represent the straw that breaks the back of the environmental camel." *Id*. at 343.

NEPA's cumulative impact analysis requirement is not satisfied where the "analysis" merely announces that there may be risks or impacts, but does not provide the kind of information about those risks or impacts that would be "useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts." *Hodel*, 865 F.2d at 299 ("perfunctory

references" do not constitute "analysis"). A cumulative impact section that merely "recites the history of [project] development" in the area and then offers the "conclusory statement" that "the cumulative direct impacts have been minimal" does not satisfy NEPA requirements. *FOE v. United States Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42 (D.D.C. 2000) (citing *Hodel*, 865 F.2d at 298). More generally, an agency must provide a reasoned explanation to support its assertions and conclusions; otherwise, its decision is arbitrary and capricious. *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) ("Alpharma").

Here, FERC failed to take a hard look at the cumulative impacts of the interconnected projects constructing a second pipeline along the 300 Line Eastern Leg, and failed to provide a reasoned basis for its determination that the cumulative impacts were insignificant. The pipeline loops added by the NEUP physically abut sections added by the 300LU at five locations. *See* AD16-18. At these locations, the same streams and local wildlife disturbed by construction, failed stormwater controls, and failed restoration of the 300LU will soon be disturbed again by NEUP construction. *See* R.379 at 36, **JA __**; R.726 at 1, **JA __**. Despite the close physical relationship of the two projects, and the fact that the 300LU was plagued by documented failures of mitigation measures, *see* R.379 at 36, **JA __**, the NEUP EA's cumulative impacts analysis lacks *any* analysis of the aggregate or synergistic impacts of re-disturbing these specific areas.

32

In response to Petitioners' claims on this issue, *see* R.379 at 17-18, **JA __-__** and R.574 at 43-45, **JA __-__**, FERC merely asserts that the cursory mention of the 300LU and NSD in the generalized overview of the cumulative impacts of FERC jurisdictional pipelines is sufficient. R.479 at P195, **JA __**; R.754 at P86, **JA __**. FERC relies on the conclusory assertion that the impacts of each project are temporary and separated by time and distance, *see* R.479 at P195, **JA __**, which plainly contradicts the reality that NEUP, NSD, and MPP segments *physically abut* 300LU areas, such that the construction serially impacts streams and wetlands in the same sub-watersheds, and deprives the same local wildlife populations of forest habitat for decades.

The only specific mention of the 300LU in the cumulative impacts section of the EA is the statement that the 300LU is one of two projects connected or adjacent to the NEUP that are "under construction with in-service dates expected in late 2011." R.350 at 2-126, **JA __**. The remainder of the cumulative impacts section lumps in the 300LU project with other nearby FERC jurisdictional projects, which it discusses summarily without any detail derived from the specific facts of those projects. With respect to all impacts, the EA states "all of the above FERC jurisdictional projects would be constructed and maintained in accordance with our approved procedures and other construction, operation, and mitigation measures

that may be required by federal, state, or local permitting authorities, further reducing the potential for cumulative impacts." R.350 at 2-127, **JA __**.

FERC's reliance on this statement as the basis for concluding that cumulative impacts of the multiple projects will be insignificant, *see* R.479 at P195, **JA __** and R.754 at P86, **JA __**, guts the purpose of a cumulative impacts analysis, which is to consider whether a series of individually minimal impacts may nonetheless collectively create significant impacts. The fact that the impacts of the individual projects may have been minimized by imposition of procedures required by FERC and other agencies does not constitute an analysis of whether the *sum* of the "minimized" impacts from each project is significant.

1.  FERC Fails to Consider the Close Spatial and Temporal Relationship of the Projects in Assessing Cumulative Impacts on Soil Stability, Water, and Wetland Resources

Regarding cumulative impacts on soils, the EA states only: "Other nearby projects under our jurisdiction would be required to implement . . . construction and restoration practices to minimize impact on soils. Consequently, any potential cumulative impacts on soils would be temporary and minor with respect to FERC jurisdictional projects." R.350 at 2-129, **JA __**. The EA lacks any assessment of whether construction of the NEUP sections will require the use of the same access routes and temporary work space areas utilized during the 300LU, potentially creating a situation where the same soils destabilized or compacted by heavy

equipment movement during the 300LU will be subject to destabilization or

compaction again during NEUP construction at the five areas where the NEUP

loops abut 300LU construction areas. The EA fails to evaluate whether

construction and restoration practices have taken into consideration the potential

that recently disturbed soils will be disturbed again within months, before even

minimal revegetation is complete.

Regarding surface water quality, the EA's only mention of impacts from

other pipelines is the general statement that the

> greatest potential impacts of pipeline construction on surface water would
> result from an increase in sediment loading to surface waters either during
> active construction within a waterbody or due to runoff from construction
> near waterbodies. The level of impact of the Project [NEUP] on surface
> waters would depend on precipitation events, sediment loads, stream
> area/velocity, channel integrity, and bed material.

*Id*. The EA does not contain any assessment of whether construction of the NEUP

sections will disturb specific tributaries, sub-watersheds, or wetlands recently

disturbed by construction of *immediately adjacent* 300LU sections in a manner that

cumulatively causes a significant impact. *See* R.350 at 2-129 to 2-131, **JA __-__**.

Further, the "analysis" is devoid of any consideration of actual sediment

discharges to water bodies and wetlands caused by recent pipeline projects in the

same areas, despite the fact that the 300LU had caused numerous pollution

incidents prior to the preparation of the NEUP EA. *See* R.381 at 7, **JA __**; R.379 at

36, **JA __**. Although the EA acknowledges that "precipitation events, sediment

loads, stream area/velocity, channel integrity, and bed material" are the factors that

determine the level of impact from pipeline construction disturbances, the EA does

not contain or refer to any analysis of these factors for past and ongoing discharges

from jurisdictional pipeline projects, such as the 300LU. More generally, the EA

neither includes nor incorporates by reference any such fact-based analysis of

impacts on the individual waterways crossed by the NEUP.

On wetlands, the EA states only: "Although construction and operation of

the Project [NEUP], along with the other projects we considered in the area, could

result in the conversion or reduction in the amount of existing wetlands in the

vicinity, the creation of new wetlands and restoration or enhancement of existing

wetlands as required by [other federal and state agencies] are expected to

appropriately mitigate for impacts on wetland resources." R.350 at 2-131, **JA __**.

Contrary to NEPA's requirements, the EA relies entirely on the bare

assumption that other entities will address *cumulative* wetland impacts for the

NEUP and all other nearby projects, impermissibly deferring FERC's NEPA

responsibilities to the scrutiny of others. *See Idaho v. Interstate Commerce

Comm'n*., 35 F.3d 585, 595-596 (D.C. Cir. 1994) ("Idaho"). An agency fails to

take a "hard look" where it "defer[s] to the scrutiny of others" by relying entirely

on conditions requiring the project proponent's compliance with environmental

36

laws imposed by other regulatory entities, and conducts no independent analysis of the environmental impact itself. *Id.*

Though the EA lists the acreage of wetlands that will be disturbed and deforested by the NEUP alone, at no point does the EA offer any analysis of the spatial relationship of wetlands affected by the 300LU and NEUP, the total acreage of wetland impacts, or the impact on wetland functionality resulting from the successive long-term disturbances, such as the impacts of tree-clearing in wetlands, which clearly are long-term impacts due to the regeneration time required for cleared areas to revert to mature forest. Furthermore, the EA does not consider whether the total amount of wetland disturbance and deforestation from the NEUP and other FERC jurisdictional pipelines will result in synergistic impacts on the surface waters connected to those wetlands. At no point does the EA consider or analyze whether the individually insignificant post-mitigation impacts on wetlands from multiple pipeline projects in the same corridor could have a cumulatively significant impact.

> 2.    FERC Fails to Address the Cumulative Impacts on Vegetation and Wildlife from the Long-Term Deforestation of a 100-Foot Wide Corridor

FERC has failed to rebut Petitioners' claims that the EA lacks analysis of the impact of deforesting a 100-foot wide corridor over the 180 mile course of the 300 Line Eastern Leg in terms of habitat loss and fragmentation. R.379 at 19, **JA __**;

37

R.574 at 28-29, 34, **JA __-__, __**. The EA states summarily that cumulative impacts on habitat fragmentation will be minor because most of the NEUP is collocated with existing right-of-way, disturbed areas will be "allowed to return to pre-existing conditions," and the NEUP will be subject to erosion control and waterbody crossing requirements imposed by FERC and other entities. Yet the EA fails to provide any actual analysis justifying these conclusions. R.350 at 2-131 to 2-132, **JA __-__**.

For the collocated portions of the new pipeline, FERC fails to consider whether the "temporary" widening of over 180 miles of cleared corridor from the original 30 feet to 75-100 feet or more[5] for the decades required for mature forest regeneration to occur will worsen the habitat fragmentation created by the establishment of the original 300 Line corridor in the 1950s. Instead, the EA conclusorily asserts that the impact of keeping an additional 25 foot of right-of-way permanently cleared will be minimal. R.350 at 2-43, **JA __**. As NJDEP commented, widening of the cleared corridor can increase the risk to animals crossing the right-of-way by increasing the distance they must travel without protective cover, thus increasing vulnerability to predators and potentially resulting in the decline of local populations for certain species, and genetic isolation, R.375

_____

[5] *See* R.350 at 2-58, Table 2.4.1-1 n. j, and 2-61, **JA __, __** (stating that construction corridor cleared is 100 feet generally, but 75 feet in wetlands *where feasible*). The cleared width exceeds 100 feet in many locations where "additional temporary workspace" is needed. *See* R.350 at 2-63, 2-64, **JA __, __**.

at 6-7, **JA __**; the risk caused by a 100 foot corridor could be significantly greater than the risk due to a ~50 foot corridor.

> 3.    FERC Fails to Analyze the Cumulative Impacts of the NSD and MPP in Light of their Proximity to 300 Line Upgrade Construction

The NEUP EA mentions the NSD project, but concludes that because it is more than 25 miles from the NEUP and is collocated, there will be no cumulative impacts in the project area. R.350 at 2-127, **JA __**. The MPP is not mentioned or discussed in the EA, but FERC's denial of Petitioners' rehearing request offers the same rationale as that for the NSD. R.754 at P86, **JA __**. The EA does not assess whether the same sub-watershed or tributary basin affected by the NEUP could be affected by the NSD or MPP. The EA provides no explanation at all for its assertion that a 25-mile distance precludes all cumulative impacts. There is no indication that the 25-mile distance reflects any rational analysis of the scale or location of environmental resources that could be affected by the projects.

Furthermore, the EA does not examine the MPP and NEUP in relation to the 300LU, or evaluate the impacts of creating a continuous linear disturbance over more than 180 miles. FERC ignores the fact that the NSD clears an additional 6.8 miles of widened corridor in the middle of the corridor cleared by the 300LU and NEUP, and that the MPP extends it by another 7.9 miles. When the NSD and MPP are taken into account, the total construction corridor for these four projects that

together complete the second pipeline is over 180 miles long. The total effect is

that what was formerly a 25 foot wide cleared corridor will be a 75-100 foot wide

cleared corridor that remains denuded of mature forest for decades. FERC does not

consider the cumulative harm of more than doubling the clear corridor width over a

continuous 180-mile stretch. For example, in FERC's analysis of the impact of

corridor width on wildlife migration, it fails to consider the continuity of the linear

disturbance from the four projects. *See* R.350 at 2-43, **JA __**.

> C.     FERC Fails to Support its Finding that Habitat Loss Due to the
>         NEUP Would Not Significantly Impact Wildlife

In addition to providing a deficient cumulative impacts assessment for

wildlife, FERC also failed to supply a reasoned analysis of the significance of

wildlife impacts resulting from the NEUP alone. As argued by Petitioners, the EA

fails to address wildlife impacts from deforestation because it relies on the

unsupported assertion that all wildlife displaced by tree clearing will simply move

to another part of the forest. *See* R.479 at P134, **JA __**; R.574 at 28-29, 34, **JA __-**

**__, __**; R.350 at 2-43, **JA __**. Agencies must provide a reasoned explanation for

their conclusions and assertions. *Alpharma,* 460 F.3d at 6. Where an EA asserts

that impacts on wildlife due to habitat loss or disturbance will be insignificant, it

must provide factual support; mere conclusory assertions standing alone are not

"analysis." *See FOE v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 38 (D.D.C.

2000) ("FOE") (EA stating that barges would not significantly impact waterbottom

ecosystems because organisms would move to other areas, but providing no factual basis for that assertion or supporting studies, did not satisfy NEPA); *Found. for North Am. Wild Sheep v. USDA,* 681 F.2d 1172, 1181 (9th Cir. 1982) (EA relying on conclusory assertion that sheep would return to disturbed habitat inadequate to support FONSI where EA contained no information or analysis on how sheep would react to the disturbed habitat).

Beyond reiterating the conclusory assertions in the EA, FERC's only response to Petitioners' claims regarding the impact of long-term forest habitat loss on wildlife is that "forested land makes up only a small portion of the project area." R.479 at P135, **JA __**. This response fails to address at all whether the 265 acres of forest that will remain deforested for decades because of the project, *see* R.350 at 2-58, **JA __**, will cause habitat loss with significant impacts for any species. As discussed below, FERC's response regarding the inadequacy of its analysis of fragmentation and edge effects on habitat availability and species mobility is also ineffectual.

The EA asserts that habitat destruction resulting from the NEUP will not be significant because most of the NEUP is collocated with the existing 300 Line, and the additional 25 feet of permanently cleared right-of-way width added to the collocated portions will not impede the movement of forest animals. *See* R.350 at 2-43, **JA __**. Critically, the EA ignores the reality that the cleared corridor will in

fact be 75-100 feet wide for the decades required for trees to regenerate and provide canopy cover, creating a much greater impediment to movement. Furthermore, the EA acknowledges that the NEUP alone will clear approximately 265 acres of forest total, of which 80 acres will be converted permanently to vegetated open or commercial/industrial land, but finds this insignificant by relying on the assertion that forest animals will be minimally affected because of the availability of similar habitat nearby. R.350 at 2-36, Table 2.3.1-3, 2-43, **JA __, __**. Problematically, the EA offers this conclusion without assessing the actual acreage of the alleged available habitat, or evaluating whether the areal extent and spatial distribution of that habitat is sufficient to support the current populations of potentially affected species. *See* R.350 at 2-43-45, **JA __ - __**. Although the EA refers to several scientific studies in acknowledging the potential for significant harm due to habitat loss, fragmentation, and edge effects, it offers no references to support its assertion that impacts will be minimal given the availability of other habitat nearby. *See id*. Just as in *FOE*, where the agency assumed that organisms would simply move away from water-bottom areas overshadowed by casino barges, but did not present any data or scientific studies to support that assumption, *see* 109 F. Supp. 2d at 38, FERC has assumed that wildlife will just move to other forest areas without providing any analytical support for the assumptions that

42

adequate habitat is available or that the 100-foot width of the cleared corridor will not impair the ability to move to other areas.

Furthermore, FERC has failed to adequately consider the impact of edge effects on the amount of forest habitat available and the creation of migration barriers. FERC responds to Petitioners' criticisms of its failure to analyze edge effects by stating that it concluded such effects would be minimal because most of the NEUP is collocated; thus "[e]dge habitat will not be created in these cases, but will be offset from its existing location to the new right-of-way edge." R.479 at P139, **JA __**; R.754 at P68, **JA __**. This statement completely ignores the issue, raised by Petitioners' EA comments, that the penetration distance of edge effects varies in proportion to the width of the cleared corridor. *See* R.379, at 7 and Exhibit B at 7, **JA __, __**; R.574 at 34, **JA __**. Thus, doubling the width of the cleared corridor for collocated portions would not merely shift the location of edge habitat, as FERC concludes, but would increase the total acreage of edge habitat by increasing the total penetration distance on both sides of the newly widened right of way. *See* R.379, Exhibit B at 7-8, **JA __-__**.

The lack of data and analysis on the impact of habitat loss is especially troubling with respect to migratory birds. The EA acknowledges that tree clearing of 265 acres of forest and 22 acres of forested wetlands will have a long-term impact on forest-dependent migratory birds, but concludes that because contiguous

43

habitat is available outside the construction corridor, the impact will not result in the listing of any species under the Endangered Species Act. R.350 at 2-44, 2-45, **JA __-__**. There is no further analysis of the extent of impacts, let alone their significance. This is problematic (1) for lack of data on available habitat, population size, and edge effects, as described above, and (2) because the EA asserts that no species will be threatened with extinction, but does not address or evaluate at all whether any species may nonetheless suffer measurable reductions in population due to the habitat loss. *See* R.350 at 2-45, **JA __**. Merely determining that a project will not threaten the continued existence of a species does not in itself satisfy NEPA, which requires that the extent of the impacts be evaluated, even if it is less than jeopardy to the species' existence. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1275-76 (10th Cir. 2004)(recognizing that conclusion of no jeopardy does not necessarily mean impacts are insignificant).

      D.    FERC Violated NEPA By Failing to Support the Assertion that Mitigation Measures Will Render Impacts Insignificant

As Petitioners argued to FERC, the FONSI violates NEPA because the EA fails to show that post-mitigation cumulative impacts to wildlife habitat and wetlands have been reduced to insignificance. *See* R.379 at 19, **JA __**; R.574 at 45, 50-51,53, **JA __, __-__, __**. In reviewing a FONSI, courts must determine whether the agency "has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the

44

impact to a minimum." *Van Antwerp*, 661 F.3d at 1153-1154. However, "changes in the project are not legally adequate to avoid an impact statement *unless they permit a determination that such impact as remains, after the change, is not 'significant.'*" *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982) ("Cabinet")(emphasis in original) (internal citation omitted) (upholding FONSI where record showed mitigation measures would "completely compensate" for impact).

An agency's mitigated FONSI also violates NEPA where it "defer[s] to the scrutiny of others" by relying entirely on conditions requiring the project proponent's future compliance with environmental laws imposed by other regulatory entities, and conducts no independent analysis of the environmental impact in question. *Idaho*, 35 F.3d at 595-596 (such total reliance with respect to impacts of even part of a project violates NEPA). *See also North Carolina v. FAA*, 957 F.2d 1125, 1129 (4th Cir. 1992) (agency does not satisfy NEPA "by simply relying on another agency's conclusions about a federal action's impact on the environment"). Although reliance on such conditions is permissible "to deal with unresolved technical issues [still remaining] after . . . a full-scale environmental analysis," an agency may not rely on such conditions "in lieu of undertaking such an analysis." *Idaho*, 35 F.3d at 596 (distinguishing the ICC's impermissible total reliance on conditions requiring compliance with other agencies from the situation

45

in *DOI v. FERC*, 952 F.2d 538, 546-547 (D.C. Cir. 1992), where FERC developed substantial evidence about the specific environmental impact in question by conducting studies and modeling for EIS, and only relied on conditions involving future study by FWS to resolve uncertainties remaining after that detailed analysis).

        1.     FERC Failed to Support Its Finding that Collocation Mitigates Impacts to Wildlife to an Insignificant Level

The EA's claim that collocation of most of the new pipeline renders wildlife impacts insignificant is based on flawed reasoning. *See* R.350 at 2-43, **JA __**. First, even assuming *arguendo* that there would be no significant wildlife impacts in the collocated portions, the EA fails to support the claim that the 6.4-mile stretch of the project that cuts a long-term 100-foot wide swath through previously undisturbed forest will not by itself result in habitat loss with significant wildlife impacts. *See* R.574 at 28, **JA __**. Second, FERC relies on a faulty comparison: it assumes that the project's collocated design itself mitigates wildlife impacts. Because FERC assumes wildlife impacts of a collocated project are less than those of a (fictional) 100% greenfield project, *ergo*, the NEUP's wildlife impacts must be insignificant. *Id.* By illegitimately assuming that the project's design acts as its own mitigation, FERC shirks its obligation to provide meaningful discussion of the actual significance of the NEUP's wildlife impacts across the length of the 40.3 miles of new pipeline construction and acres of forest clearing.

46

2.     FERC Failed to Support its Finding that the Cumulative Impact
on Wetlands Would Be Mitigated to Insignificant Levels

The EA's discussion on wetlands is defective not only in its lack of any

actual cumulative impacts analysis, as discussed above, but also for its assumption

that then-future decisions by state and federal agencies would mitigate wetlands

impacts to insignificant levels. R.350 at 2-131, **JA __**. The EA concedes that the

individual impact of the NEUP will convert acres of forested wetlands to non-

forested wetlands, which "could result in changes to wetland functions and

values," and acknowledges that TGP's proposed mitigation plan is intended to

"compensate" for those changes. *Id*. at 2-28 to 2-29, JA __-__. The EA describes

the proposed mitigation plan, but, as shown below, does not analyze its efficacy.

*See id*.

Although the EA does include some evaluation of the NEUP's individual

impact on wetlands, R.350 at 2-28 to 2-29, **JA __-__**, the EA does not engage in

any independent assessment of the *cumulative* impacts on wetlands, and instead

relies entirely on the assumption that future actions by other governmental entities,

such as the U.S. Army Corps of Engineers ("USACE") and state agencies, would

impose conditions to reduce cumulative impacts to insignficance. *See* R.350 at 2-

131, **JA __**. FERC merely asserts that individual wetland impacts for each project

are "minimized" by conformity with its generic "Plan and Procedures" for erosion

control and wetland crossings, and that any significant impacts requiring wetland

47

replacement will be addressed by USACE. *See* R.479 at P90, **JA __**. FERC failed to engage in any analysis of whether TGP's proposed wetland replacement will actually reduce either individual or cumulative wetland impacts to insignificant levels. *See* R.479 at P91, **JA __**. In response to a PCCD comment that the location of TGP's proposed off-site wetland replacement area would not address impacts in the geographic area adversely affected by pipeline construction, FERC states only that the county should raise this complaint to the USACE rather than FERC. *Id*.

Because the EA does not independently evaluate the extent to which TGP's proposed mitigation measures will reduce cumulative impacts to wetlands, the EA fails to demonstrate the insignificance of the total cumulative impacts that remain after mitigation. Unlike the EA and FONSI upheld in *Cabinet*, where the Forest Service's EA showed that the specific mitigation plan proposed would "completely compensate" for any potential harm based on the Forest Service's analysis of an existing FWS biological opinion, *see* 685 F.2d at 680-681, FERC's EA here contains no analysis at all to show that the proposed replacement will reduce wetlands harms to insignificance.

Furthermore, because the EA entirely relies on the USACE and state agencies to evaluate whether TGP's proposed mitigation will adequately reduce cumulative impacts to wetlands to insignificance, FERC has impermissibly deferred to the scrutiny of others. *See Idaho*, 35 F.3d at 595-596. Here, unlike in

48

*DOI v. FERC*, where FERC performed extensive studies and modeling on fish kills to gauge the impact of a proposed dam, FERC has not conducted a full-scale analysis of cumulative impacts to wetlands that is merely supplemented by a post-FONSI action by the USACE. Instead, like the ICC in *Idaho* did with respect to one portion of the project, FERC has conducted no analysis at all to support its claim that the cumulative wetland impacts are insignificant. This failure is particularly egregious given the specific regulatory command that agencies should consider cumulative impacts and wetland impacts in evaluating the intensity of environmental impacts for purposes of the significance determination. *See* 40 C.F.R. § 1508.27(b)(3),(7).

Whether or not the EA shows that the individual impacts of the various pipeline projects have been "minimized" by compliance with FERC-imposed conditions on construction methods, *see* R.479 at PP134-135, **JA \_\_-\_\_**, R.754 at P86, **JA \_\_**, the EA fails to assess their cumulative impact. Merely stating that the impact of each individual project was minimized by the imposition of mitigation measures does not constitute an analysis of whether the total effect of the overlapping of the "minimized" impacts resulting from each project has an overall significant impact on wetland resources. Such an analysis would require a hard look at the spatial relationships of the individual pipeline projects to wetland areas and waterbodies connected to those wetlands, which is totally absent from the EA.

49

In sum, FERC violated NEPA by failing to provide any independent analysis to support a conclusion that TGP's proposed wetland replacement plans would reduce cumulative wetlands impacts, a key part of the significance determination under NEPA regulations, to insignificant levels. Instead, FERC relied entirely on a post-FONSI evaluation to be conducted by other agencies, impermissibly deferring its analytical duties under NEPA.

## CONCLUSION

For the foregoing reasons, Petitioners urge this Court to set aside FERC's orders and remand this matter for further action.

Respectfully submitted this 26th day of April, 2013,

/s/ Jane P.D. McClintock
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
215-369-1188 (tel)

/s/ Susan Kraham
Columbia Environmental Law Clinic
Columbia University School of Law
425 West 116th Street
New York, NY 10027
212-854-4376 (tel)

*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,897 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  In determining the word count, I have relied on the automatic word count feature of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Jane P.D. McClintock

/s/ Susan Kraham

Dated: April 26, 2013

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 26, 2013, I filed the original of the foregoing Brief and Addendum via the Court's CM/ECF system, thereby causing an electronic copy to be served on all parties registered to receive notices in this case via electronic noticing. I further certify that I mailed a copy of the foregoing via U.S. Mail, first-class postage prepaid, to the following counsel of record:

David Wallace, Esq.
David Wallace Law Offices
P.O. Box 1848
399 Clove Rd
Montague, NJ 07827

/s/ Jane P.D. McClintock
Jane P.D. McClintock